Affirmed and Opinion filed June 24, 2008








 Affirmed and Opinion filed June 24, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00978-CV

____________

 

SPRING CREEK VILLAGE APARTMENTS
PHASE V, INC.,
Appellant

 

V.

 

GENERAL STAR INDEMNITY COMPANY, Appellee

 



 

On Appeal from the 334th
District Court

Harris County, Texas

Trial Court Cause No. 98-28666

 



 

O P I N I O N








This dispute concerning payments allegedly due under an
excess insurance policy is before a court of appeals for the third time.  In
the instant suit, after a jury found covered damages in an amount less than the
limits of the primary coverage, the trial court rendered a take-nothing
judgment in favor of the excess insurer.  On appeal, the insured argues that
the amount of covered damages found by the jury is so small as to be against
the overwhelming weight of the evidence.  Because the jury=s finding is
within the range of the evidence presented relevant to the issue of covered
damages and is not against the great weight of the evidence, we affirm the
trial court=s judgment.

I.  Factual and Procedural Background

At the time of the events discussed below, Spring Creek
Village Apartments Phase V, Inc. (ASpring Creek@) had primary
insurance coverage with Reliance Insurance Company of Illinois (AReliance@) for property
damage and loss of business income up to $1 million.  In the event of covered
property damage, the terms of the policy required Spring Creek to send repair
estimates to the insurer and receive actual cash value for the damaged property
in return.  After repairs were complete, Spring Creek could submit a waiver and
lien release from the contractor, and in return, would receive the difference
between actual cash value and replacement cost.  Spring Creek also had excess
coverage exceeding the $1 million primary policy limit through General Star
Indemnity Company (AGeneral Star@).  By its terms,
the General Star policy only applied after the coverage provided by Reliance
was exhausted.  Otherwise, the General Star policy followed the terms,
conditions, and definitions of coverage and recovery stated in the Reliance
policy.

A.      Immediate
Response to the Tornado








On February 10, 1998, a category F-1[1]
tornado caused
damage to the Spring Creek Village Apartments.[2] 
The next day, owner Archie Tracy contracted with public adjusters Jansen &
Co. to adjust the loss.  A day later, Reliance=s adjustor, Don
McLain, together with Greg Herring of Jansen & Co. and Deborah Frazier of
Cavalry Construction,[3]
began to evaluate the scope of the damage from the tornado.  At that time, blue
tarpaulins had been fastened or nailed to the damaged roofs of the buildings. 
Tracy wrote to McLain and stated that damage would increase with rain.  McLain
responded, AIt appears that you have taken steps [to] protect the
exposed structure by fastening sheet plastic over the affected areas.  To this
end, you are taking the necessary steps to mitigate the potential for future
damage in the event the apartments are exposed to additional rainfall. 
However, we agree that temporary covers will not withstand any moderate to
severe storm activity.@

Approximately one week  later, on February 18, 1998,
General Star personnel wrote to Tracy and purported to summarize an earlier
conversation, stating, AAs per our telephone conversations it has
been determined that the damage from this incident will not approach
$1,000,000.00.@  The next day, Southwest Services, Inc. (ASouthwest@), a company owned
by Chris Purcell and George Farmer, approached Tracy with a repair proposal. 
Southwest offered to apply white epoxy to the roofs at a cost of $349,455.00.[4] 
Tracy then completed a sworn statement in proof of loss on February 26, 1998 in
exchange for a $50,000 advance payment.  During the remainder of the month, AC
Roofing & Construction (AAC Roofing@) replaced the
blue tarpaulins on the damaged roofs with temporary repairs to prevent further
damage.

B.      The
Calvary and Jansen Estimates

On March 11, 1998, Deborah Frazier estimated that interior
repairs would cost $226,988.54.  The following day, Calvary estimated that roof
repairs would cost $149,740.55.   According to Spring Creek, Greg Herring also
completed his estimate (the AJansen estimate@) on or about
March 12, 1998.  The property damages listed in the Jansen estimate totaled
$444,492.30. 








C.      Global Steel Builders

Tracy was unhappy with these estimates, and on March 18,
1998, he contracted with Global Steel Builders Afor the service of
managing, adjusting and reconstructing certain portions of this apartment
complex at the discretion of Archie Tracy.@  The contract
provided:

Spring Creek Village Apartments, Phase V, Inc. agrees to pay Global
Steel Builders ten percent of the twenty percent overhead and profits final
amount.  Global Steel Builders will also receive a twenty percent bonus for
raising the claim above it=s [sic] original amount.  When the final (partial agreement settlement)
is signed by Archie Tracy from Jansen & Company, Global Steel Builders also
agrees to reimburse Spring Creek Village Apartments, Phase V, Inc., five
percent of the bonus monies owed to Jansen & Company from their profits.

Global
Steel listed the same address and fax number as Southwest Services, and the
contract was signed on Global Steel=s behalf by
Christopher R. Purcell, the co-owner of Southwest Services.

The following day, Tracy executed a AConsignment of
Interest@ appointing Global
Steel as Spring Creek=s agent.  He also wrote McLain that he
would Abring in
additional construction experts to evaluate the damage so that a fair
settlement can be made.@ 

In the meantime, Tracy continued to receive other repair
offers.  On March 21, 1998,  AC Roofing offered to complete roof repairs for
$140,973.85, with payment due ten days after completion of work.  AC Roofing
also offered to replace all mansard roof systems with fiberglass self-seal
asphalt shingles at a cost of $63,000.00.  According to Alton Christian, AC
Roofing=s owner, the work
could have been completed within three weeks.








Two days after AC Roofing made this offer, Global Steel
estimated it would cost $3,054,248.80 to repair the exteriors of the
apartments.  Global Steel then covered the roofs of the apartment complex with
sheets of clear visquine.  The visquine  was attached with Anailers,@ consisting of 1@ x 4@ boards with nails
driven through the board and into the roof.[5]


D.      Leaking
Roofs and Reinspections 

On April 8, 1998, Tracy wrote to McLain as follows: 

Until we fix the roofs - which are
all leaking from the windstorm I can=t fix the
sheetrock and carpet etc. . . I have been telling you for weeks . . . most of
my roofs are leaking from the windstorm.  I would love to work with you, but
you have not been interested in funding the project and we continue to leak.  I
could place more traps [sic] over all the leaks until we can agree on a scope
of damages - What do you think?

McLain
immediately responded, AIf your roofs have been leaking since the
temporary repairs were installed, you certainly haven=t disclosed this
fact to us.  If you advised Jansen & Co. of this problem, they haven=t disclosed this
to us either.@  McLain advised Tracy of the need to schedule a visit
and asked that Aall other individuals acting on your
behalf@ attend.  He also
asked for estimates from restoration contractors.  One week later, Tracy wrote
to McLain that, effective April 16, 1998, Chris Purcell, rather than Jansen
& Co., would be representing Spring Creek.








McLain reinspected the roofs on April 22, 1998, but Tracy
did not attend.  At that time, McLain saw that the blue tarpaulins had been
replaced with visquine nailed through roofs, and that visquine also covered
buildings that had not previously been covered with tarpaulins. According to
McLain, this caused additional water damage by puncturing roof membranes and
allowing water to pool.  Later that day, McLain wrote to Tracy, stating that
McLain had brought checks for $286,302.32 for the actual cash value of the
damages[6]
to the meeting but Tracy had not attended, and Tracy=s son Scott could
not sign the Proof of Loss.  McLain stated that negligently-installed plastic
punctured the roof membrane, trapped water, and caused wet sheetrock.  Tracy
then wrote to General Star and stated that the loss would exceed $1 million.

In response to inquiries from McLain, Alton Christian,
owner of AC Roofing, wrote that his company worked from February 20 through the
end of that month performing temporary patching authorized by Greg Herring.  He
further stated that he had been back on several occasions for patching, and ATo date everything
is fine to the best of my knowledge.  I have received no calls.@ 

E.      City Wide
Construction

On May 11, 1998, an AAppraisal Agreement@ was executed
between Global Steel, Spring Creek, and City Wide Construction, owned by Steve
Edwards.  Under the terms of this agreement, Spring Creek agreed to Acompensate City
Wide for its time and costs incurred in this process, for an amount not to
exceed [five] (5%) percent of the gross settlement amount.@  This agreement
also provided City Wide with a larger percentage share of any gross settlement
amount if Spring Creek=s loss exceeded $2,000,000.  Three days
after this agreement was executed, Tracy sent a certified letter to Reliance in
which he invoked the appraisal procedure described in the Reliance insurance
policy.

F.       The
Appraisal Process

Under the terms of the Reliance policy, if the parties
disagreed as to the amount of a loss, either party could demand an appraisal. 
Both parties were required to Aselect a competent and impartial
appraiser,@ and the two appraisers would select an umpire.  An
agreement between any two of these three individuals regarding the amount of
the loss would be binding.  Because General Star owed no obligation to Spring
Creek until the loss exceeded $1 million, General Star did not participate in
the appraisal process.








Spring Creek named Edwards as its appraiser.  Reliance
hired John Lochridge, Jr., of Unified Building Sciences, Inc., and Leonard
Taylor was selected as the umpire.  Both Edwards and Taylor engaged Greg
Presswood to evaluate the amount of damage to the interior of the apartments. 
Edwards then estimated the amount of loss to Spring Creek at $5,286,000, but
Lochridge estimated the amount of loss at $293,120.01.  Taylor found
replacement cost value of the loss to be $2,105,790.98, with an actual cash
value of $1,566,673.51.  Both Taylor and Edwards signed the award.

G.      Suit is
Filed

Reliance filed a declaratory judgment action seeking to
have the appraisal award declared invalid on the grounds that (1) it
contained items not covered under the policy, and (2) the umpire exceeded
his authority in making causation and coverage determinations.  A Reliance
officer[7]
cited Lochridge=s expressions of concern regarding Athe fact that the
insured=s appraiser and
the umpire were unwilling to segregate those damages which were caused by the
windstorm from those damages which were not caused by the windstorm.@ Spring Creek
filed a counterclaim seeking enforcement of the award.  On September 14, 1999,
Spring Creek=s counsel wrote to Anthony R. Colucci, a claims
examiner for General Star Management Company, and asked General Star to Apay the
$1,105,790.98 due in excess of the $1,000,000 primary coverage.@  General Star did
not pay, and Spring Creek filed a third-party action against General Star.  

H.      Summary Judgments








In November 2000, the trial court granted partial summary
judgment in favor of Spring Creek and held that the appraisal award was
binding.[8] 
The trial court=s ruling left undecided the question of
whether Spring Creek had failed to mitigate its damages.[9] 
In December 2000, the trial court granted summary judgment in favor of General
Star, holding that Spring Creek had no cause of action against General Star for
breach of the duty of good faith and fair dealing.[10]

I.        First
Jury Trial

          In
2001, the first trial of the contractual claims resulted in a jury verdict in
favor of Spring Creek, and damages were assessed based on the appraisal award.[11] 
Reliance was severed from the case, and General Star appealed the interlocutory
judgment on Spring Creek=s contractual claims.  The appeal was
dismissed and the case remanded.[12]


J.       Second Jury Trial








The second trial addressed Spring Creek=s extracontractual
claims, and ended in a judgment that General Star violated provisions of the
Texas Insurance Code and the Deceptive Trade Practices Act (ADTPA@).  The trial
court entered final judgment awarding Spring Creek damages pursuant to the
appraisal award, penalties under the Insurance Code and the DTPA, and attorneys= fees.[13] 
General Star appealed.  This court affirmed the trial court=s judgment that
General Star did not owe Spring Creek a duty of good faith and fair dealing,
but reversed summary judgment in favor of Spring Creek on its attempt to
enforce Taylor=s award.[14]  
We explained that because Edwards had a financial interest in returning an
estimate above $2 million, there was a fact issue concerning his impartiality.[15] 
Moreover, Taylor submitted an affidavit in which he stated that he relied in
part on the appraisers= determinations of loss.[16] 
The case was therefore remanded a second time.

K.      Third Jury
Trial

On remand, the trial court granted Spring Creek partial
summary judgment on the ground that there was no evidence it failed to mitigate
its damages.  Spring Creek subsequently abandoned its claim that General Star
was bound by Taylor=s appraisal award.

The jury found that General Star did not fail to comply
with its insurance policy, and that Spring Creek=s appraiser, Steve
Edwards, was not impartial.[17] 
As a result of this finding, which is not challenged on appeal, the appraisal
award is no longer binding.[18] 
The jury further found that the total amount of tornado-related property
damages sustained by Spring Creek had a replacement cost value of $444,492.00
and an actual cash value of $377,818.20.  Because the damages found by the jury
did not reach General Star=s layer of coverage, the trial court
signed a take-nothing judgment in General Star=s favor.[19] 









After the trial court denied Spring Creek=s motion for new
trial, Spring Creek brought this appeal challenging the factual sufficiency of
the property damage evidence and the trial court=s denial of its
motion for new trial.  Because we are required to review all the evidence to
determine factual sufficiency, the key property damage testimony is summarized
below.

L.       Key
Property Damage Testimony

1.       Alton
Christian, AC Roofing & Construction

Christian testified that between February 25 and March 1,
1998, AC Roofing replaced the blue tarpaulins over the damaged roofs with
temporary repairs.  He stated that Athis would prevent
further damage caused by the tornado,@ and guaranteed it
would prevent 90% of additional rain from entering.  Christian further
testified that the buildings showed signs of preexisting leaks.

2.       Scott
Tracy, Archie Tracy=s Son

Scott Tracy (AScott@) testified that
Spring Creek=s maintenance personnel put sheets of blue tarpaulins
over the damaged roofs immediately after the tornado.  According to Scott,
these were not installed on every roof, but on some buildings, the tarpaulins
were nailed to the mansards and through the roof.  He testified that Dan McLain
came to the site the day after the storm and did not object to the way the
plastic was nailed to the roofs.[20]









Scott stated that Global Steel personnel nailed visquine to
the roof mansards between April 10 and April 18, 1998.  He also described the
meeting between himself, McLain, Frazier, Frank Jones from Jansen & Co.,
Tracy=s other son
William Buzzell, and Chris Purcell of Global Steel.  According to Scott, the
group entered only one apartment and went onto one roof[21]
before the other attendees became upset by some of Scott=s remarks and
left.  Scott testified that McLain wrote to Spring Creek on April 22, 1998
complaining of the visquine nailed to the roofs, so the material was removed
and the resultant nail holes were patched with the same type of epoxy referred
to in the Southwest Service bid. 

According to Scott, Chris Purcell of Global Steel
introduced him to Steve Edwards of City Wide Construction, and Edwards proposed
Taylor as an umpire.  Finally, Scott agreed that General Star had no obligation
to pay Spring Creek before the appraisal award, and that there was currently no
binding appraisal award. 

3.       Deborah
Frazier, Calvary Construction Co. 

Frazier testified that she inspected apartments on six
occasions between February 12 and March 4, 1998.  According to Frazier, she and
Greg Herring inspected every unit for which they were given a key.  She
testified that all work, from scope to final inspections, could have been performed
in 18 weeks, and Calvary could have performed the repairs at the prices quoted
in its estimate.  Frazier also testified that only a minimal amount of water
could possibly get in through temporary repairs, but nailing visquine to the
roof through 1@ x 4@ nailers could have caused new damage.

4.       Greg
Herring, Jansen & Co.

Herring testified that he walked over all of the roofs more
than once, and his estimate was his independent opinion regarding the scope of
the damage.  He also indicated that damage could increase in the time between
an estimate and the repairs.

5.       Anthony
Colucci, Claims Adjuster for General Star

According to Colucci, both McLain and Scott Tracy told him
immediately after the loss that the damage would not approach a million
dollars. 








6.       Art Jansen, Jansen & Co.

Jansen testified that he Aspot-checked Greg
[Herring]=s work.@  He stated that
he was comfortable with Herring=s assessment.  Jansen further stated, AI didn=t think it was a
million-dollar loss when we were involved.@

7.       Greg Presswood

Greg Presswood inspected Spring Creek and provided the Ascope@ used in the
estimates prepared by Steve Edwards of City Wide Construction and umpire
Leonard Taylor.  According to Presswood, Taylor began with Edwards=s estimate and
removed items from it or reduced the pricing until the total amounted to $2.1
million.  Presswood described Edwards=s instructions to
him as follows:

Q:      Tell the jury what Mr. Edwards instructed
you to include in your scope?

A:      Mr. Edwards indicated that it wasn=t my job to determine where the
damage came from, that it was only my job to note that there was damage in the
unit.  So, whatever kind of damage I found, I was supposed to make a note of
that then turn those notes into [sic] him.

Q:      Did he instruct you to include any blemish
in any apartment unit, no matter what the cost [sic]?[[22]]

A:      Yes.

Q:      So that if you walked into an apartment unit
and found stained carpet, no matter what the cause, you were to include
replacement or repair or something in your estimate on that carpet?

A:      Actually, I would make the note that there
was damage in that unit.  Then Mr. Edwards reviewed the scope notes and then
ultimately told me what to put in.  But in the largest of the three estimates
that I wrote, that one did include just about everything that we had in the
scope notes.  I can=t tell you with absolute certainty
that everything was included, but just about everything that was on my notes
wound up in Mr. Edwards=[s] estimate.








Q:      And that would include things that, based on
your observations, were obviously not caused by the storm?

A:      Some of them, yes.

. . .

Q:      Did Mr. Edwards instruct you to include in
the estimate damage caused from any and every source?

A:      Yes.

Q:      Did that include stains in ceiling and
carpet and wall damage from any source?

A:      Yes.

Q:      Did he instruct you to prepare an estimate
of damages in the apartment complex regardless of the source of the damage?

A:      Yes.

Q:      Did he instruct you to help him prepare an
estimate that included every blemish out there?

A:      Yes.

Presswood further testified that Edwards introduced him to
Taylor and invited Presswood to an off-shore fishing trip with Taylor and
another umpire nominee suggested by Edwards.  Presswood stated, A[T]hey had asked
me not to say anything about going on the fishing trip because they thought I
wouldn=t B might not be
appropriate for Mr. Taylor and Mr. Edwards to be on the same boat.@  According to
Presswood, Edwards and Taylor had known one another for years, and AMr. Edwards told
me I should not repeat it to anyone.@ 

8.       Leonard Harvey Taylor, Umpire

Taylor agreed that his estimate included damages that may
have resulted from leaking roofs that were not damaged by the tornado.  On the
other hand, he also denied that he included interior damage that he did not
believe was caused by the tornado.  He agreed that the Calvary and Jansen
estimates may have been accurate at the time they were written.  He further
testified:








Q:      In fact, you have attempted in your estimate
to only include weather-related damage that you  observed, correct?

A:      Yes, that=s correct.

Q:      And you don=t know if it was weather-related from before the
February >98 storm or during that storm or
after that storm.  Fair to say?

A:      That=s correct.

Q:      So what you have got in your estimate may
well be damage that was caused prior to the storm, correct?

A:      Yes, sir.

. . .

Q:      You haven=t tried to make any calculation as to how much damage is in
that estimate which leaked though a flat roof, not as a result of an opening
caused by the storm?

A:      No, sir.

Taylor stated that he might have met Presswood on the date
Presswood identified, but testified that he had not been on a fishing trip with
Edwards.

9.       Cipriano
Sanchez

Sanchez testified that he replaced the roofs on 16
buildings after the tornado, and in the year before the tornado, he patched the
roofs on 20 of the 29 buildings in the complex. 

10.     John Lochridge, Jr., Unified Building Sciences,
Inc.

Lochridge estimated the covered property damage at
$293,120.01.

11.     William Buzzell, Maintenance, Spring Creek

Buzzell, one of Archie Tracy=s sons, testified
that he supervised repairs and thought they could have been performed in a
month.  








12.     Archie
Tracy, Owner, Spring Creek

Tracy testified that his maintenance personnel immediately
nailed blue tarpaulins to the damaged roofs with 2@ x 4@s.  He had also
applied Aone-ply hot tar
with felt@ to the damaged roofs.[23]  


Tracy testified that Chris Purcell of Global Steel told him
to invoke the appraisal provision and suggested that Edwards be named as Spring
Creek=s appraiser. 
Tracy explained that he did not understand at that time that he was required to
use a competent and impartial appraiser.  He agreed that Global Steel covered
more roofs than had previously been covered with blue tarpaulins, but stated
that this was because the roofs were leaking.  He further testified that the
visquine was removed after McLain complained:

Q:      Well, if you thought you needed to put these
covers on to slow down the leaks, so to say, why did you take them off?

A:      Well, just B I was just doing what I B you know, good question.

Q:      Well, you got this complaint from McLain B

A:      I know.  That=s why I took them off.  Now, in 20/20 hindsight, you
know, I was trying to B I was just trying to do the right
things here.

Q:      Well, why hadn=t you already started by this time, mid-April, the
permanent roof repair replacement?

A:      I didn=t have the money
at that time.

It is undisputed that the $50,000 check for temporary
repairs was dated February 27, 1998, and Tracy subsequently testified that he
received it on March 11, 1998.  In addition, Tracy testified regarding prior
roof leaks and repairs.  Tracy agreed that he replaced two roofs in 1996 and
was invoiced $5,280 for one and $6,525 for the other.  A third roof was
replaced for $7,200.   








Tracy stated that he thought he could not perform repairs
until the appraisers were finished.  He also explained that he hired David
Booth=s construction
company in October 1998 to perform repairs because Booth was willing to start
work without an advance payment.[24] 
According to Tracy, the prices for the roof replacements were higher than those
Tracy had previously paid for roofing because A[w]hen you don=t have the money,
you usually pay more.  Like if you don=t have money to
buy a car, you get 18 percent interest.@ 

13.     Donald Laurent

Laurent was hired by subsequent owners of the apartment
complex in 2001 to replace 11 roofs.  He testified that $600,000B800,000 of tornado
damage still remained at that time.

II.  Issues Presented

Spring Creek first challenges the factual sufficiency of
the damages evidence, contending the award is manifestly too small and against
the overwhelming weight of the evidence.  For this reason, Spring Creek asserts
in its second issue that the trial court abused its discretion in denying
Spring Creek=s motion for new trial. 

III.   Preservation of Error

As a threshold issue, we must first address General Star=s contention that
Spring Creek has waived its complaints on appeal by failing to argue that
harmful error was committed, a subject discussed infra.  Specifically,
General Star contends that Spring Creek failed to argue on appeal that the jury
was required to find damages in excess of $1 million. 








We disagree, however, with General Star=s statement that
Spring Creek failed to allege harmful error.   Although Spring Creek does not 
use the term Aharmful error@ or cite to the
rule governing reversible error in civil cases, it states in its brief, ABecause the jury=s damage award was
less than the amount of the $1 million primary insurance policy issued by
Reliance, the trial court entered a take-nothing judgment in General Star=s favor.@[25]  In support of
its argument that the jury=s award was manifestly too small, Spring
Creek relies  in part on repair estimates exceeding $1 million.  We therefore
interpret  Spring Creek=s arguments to include that the jury erred
in its calculation of damages, and that the error was harmful because it Aprobably caused
the rendition of an improper judgment.@  See Tex. R. App. P. 44.1(a)(1). 

IV.  Analysis

A. 
Standard of Review








When considering a factual sufficiency challenge to a jury=s verdict, we must
review and weigh all the evidence, not just the evidence that supports the
verdict.  See Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 406B07 (Tex. 1998); Nip
v. Checkpoint Sys., Inc., 154 S.W.3d 767, 768B69 (Tex. App.CHouston [14th
Dist.] 2004, no pet.).  To successfully challenge the factual sufficiency of
the evidence supporting an adverse finding on an issue on which the appellant
had the burden of proof, the appellant must demonstrate that the adverse
finding is against the great weight and preponderance of the evidence.  Dow
Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam).  We may
set aside the verdict only if it is so contrary to the overwhelming weight of
the evidence that the verdict is clearly wrong and unjust.  Id. (citing Pool
v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986)); Mar. Overseas Corp.,
971 S.W.2d at 407; Nip, 154 S.W.3d at 769.  We will not reverse unless
the error about which the appellant complains probably caused the rendition of
an improper judgment.  Tex. R. App. P. 44.1(a)(1). 
Moreover, we are not permitted to Afocus only on the
weakest evidence supporting the judgment and then choose to believe witnesses
that the fact-finder below found unpersuasive.@  Ortiz v.
Jones, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam); see also Farr v. Bell,
460 S.W.2d 431, 434B35 (Tex. Civ. App.CDallas 1970, writ
ref=d n.r.e.) (AEven though the
findings of fact are not conclusive on appeal, we have no authority under the
facts of this case to hold that the trial court should have believed the
witnesses whose testimony it saw fit not to believe.@).  We may not
simply substitute our judgment for that of the jury.  Golden Eagle Archery,
Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003).

B.      Range of
Evidence

The factfinder
faced with conflicting evidence may choose which witnesses to believe and may
resolve inconsistencies in any witness=s testimony.  McGalliard
v. Kuhlmann, 722 S.W.2d 694, 697 (Tex. 1986) (citing Ford v. Panhandle
& Santa Fe Ry. Co., 151 Tex. 538, 543, 252 S.W.2d 561, 563 (1952) and Benoit
v. Wilson, 150 Tex. 273, 282, 239 S.W.2d 792, 797 (1951)).  In particular,
the trier of fact Ais afforded considerable discretion in
evaluating opinion testimony on the issue of damages.@  Id. 
Thus, it is well-established that the jury has discretion to award damages
within the range of evidence presented at trial.[26]
          

Here, the jury heard evidence of several estimates for the
total amount of property damage.  Lochridge estimated the damage at
$293,120.01.  Calvary Construction=s estimate totaled
$376,729.09.  The Jansen estimate included total covered property damages in
the amount of  $444,492.30.  Taylor=s estimate of
replacement costs totaled $2,105,790.98 with an actual cash value of
$1,566,673.51, and Edwards produced an estimate of $5,286,005.56.








The jury found that Spring Creek suffered covered property
damage with a replacement cost of $444,492.00 and an actual cash value of
$377,818.20.  These figures are within the range of the evidence: they are
greater than the amount of damages estimated by Lochridge and Calvary, and are
exceeded only by the estimates of Edwards and Taylor.  On appeal, however,
Spring Creek denies that the amount of covered property damage found by the
jury is supported by the record, arguing instead that these damages are too
low.

C.      Sufficiency
of Supporting Testimony

Spring Creek argues that General Star offered no competent
expert testimony supporting the jury=s award.  In
support of this argument, Spring Creek relies on Prescott v. Kroger Co.  877
S.W.2d 373, 374B76 (Tex. App.CHouston [1st
Dist.] 1994, writ denied).  In that case, the First Court of Appeals held that
because the jury found that the plaintiff=s surgery and
medical treatment for a herniated disk were the result of the incident made the
subject of the suit, the verdict awarding zero damages for past pain and
suffering was manifestly unjust.  Id.  

In Prescott, causation was established, and the
evidence of pain was uncontroverted.  Id.  Here, however, the jury heard
conflicting evidence regarding causation, the scope of damages, and the costs
of repair or replacement, and resolved the conflict within the range of the
evidence. Without repeating the previously-summarized testimony, the jury=s determination of
damages is supported by the testimony of Frazier, McLain, Christian, Lochridge,
and Herring, each of whom calculated covered property damage at an amount
approximately equal to or less than the damages found by the jury.  The finding
is also supported by documentary evidence such as itemized estimates and
invoices for past repairs.  The take-nothing judgment, which is based on the
jury=s finding of
damages in an amount less than $1 million, is further supported by the
previously-summarized testimony of Colluci, Sanchez, and Jansen.








D.      Damages
After March 12, 1998

Spring Creek also
contends that roof repairs were delayed until late 1998  due to slow insurance
payments and the need for repeated property inspections.  Spring Creek further
asserts that the jury awarded damages only through March 12, 1998 despite
uncontroverted testimony from Christian, Frazier, Sanchez, Laurent, and Taylor
regarding subsequent damage to apartment interiors.  Thus,  Spring Creek
reasons, the damage award is manifestly too small and against the overwhelming
weight of the evidence presented at trial.

We must reject
this argument for several reasons.  First, it is predicated on  assumptions
that cannot be inferred from the findings, but instead are contrary to the
presumptions we are required to apply.  Moreover, the evidence is not
uncontroverted as Spring Creek suggests.  And finally, even if we could accept
all of these contentions, they are insufficient to demonstrate reversible
error.  As discussed below, each of these reasons is independently sufficient
to overrule Spring Creek=s first issue.

1.       Inapplicable Assumptions

Spring Creek=s argument is
based on its assumptions that (a) the jury adopted the Jansen estimate
prepared on or about March 12, 1998; (b) additional tornado-related
damages that arose after March 12, 1998 were not included in the Jansen
estimate; and thus, (c) the jury failed to consider covered damages that
arose after March 12, 1998.[27] 









It is true that the jury=s finding
regarding the replacement cost of damaged property differed from the Jansen
estimate by only $0.30.  But however plausible Spring Creek=s theory of the
jury=s analysis might
be, the jury=s reasons for reaching a particular damage award are
irrelevant in the absence of jury misconduct.  See First Nat=l Bank in Dallas
v. Zimmerman, 442 S.W.2d 674, 678 (Tex. 1969) (jury=s reasoning
process is irrelevant absent jury misconduct); Vela, 203 S.W.3d at 48
(the jury=s mental processes in determining the amount of
damages are not ordinarily cognizable by an appellate court).[28] 
And Spring Creek offers no authority for this court Ato go behind the
jury=s consideration,
determination, and weighing of the evidence@ in evaluating the
damage award.  See Mo. Pac. R.R. Co. v. Roberson, 25 S.W.3d 251, 259
(Tex. App.CBeaumont 2000, no pet.) (evaluating allegedly
excessive damage award and refusing to consider jury=s reasoning in
arriving at its finding).

To the contrary, in reviewing a damage award for factual
sufficiency, we generally begin with the jury charge and instructions.  Golden
Eagle Archery, 116 S.W.3d at 762.  Here, the jury was asked to determine
the total amount of Spring Creek=s covered property
damages Athat were caused
by or that resulted from the February 10, 1998 tornado.@  The jury was
instructed to include damage caused by water that entered structures through Aany damage or opening
caused by@ the tornado.[29] 
This instruction contained no time limitation.  Because we presume the jury
followed the trial court=s instructions,[30]
we cannot infer that the jury restricted its consideration to those damages
that arose by March 12, 1998.  Instead, we presume that the jury considered all
interior damage caused by tornado damage.

2.       Controverted
Testimony

We must also reject Spring Creek=s contention that
the testimony of various witnesses is uncontroverted on the subject of
tornado-related damages that arose after March 12, 1998.

a.       Alton
Christian=s Testimony








Spring Creek relies on Christian=s agreement with
the statement that Ait doesn=t make a whole lot
of sense to try to estimate the scope of interior damages until the roofs have
been replaced . . . .@  But Christian
also testified that he patched the roofs to Aprevent further
damage@ and completed
that work on March 1, 1998.  All of the estimates of interior damage are dated
after he concluded those repairs. 

b.       Deborah
Frazier=s Testimony

Spring Creek also relies on Frazier=s testimony, such
as the following:

Q:      You have already told us you would expect to
have damages enhanced by reason of roof replacement after rain and the same
thing would be true with respect to the time period after March 4, your last
scoping, until you were there in April, i.e., you would expect the damage to be
enhanced by reason of the rains that fell in the interim, isn=t that true?

A:      A certain
amount of rain could have gotten into those units, yes, sir.

But Frazier also testified that any additional damage would
be A[v]ery minimal@ and she Awouldn=t think that rain
would come in if roofs were tarped.@  As previously
indicated, Spring Creek covered damaged roofs with tarpaulins immediately after
the tornado, and AC Roofing performed temporary repairs by the end of that
month.

Moreover, Frazier agreed that rain damage arising after
March 4, 1998 could have been caused from Global Steel=s actions in
driving nails through the roofs to attach plastic coverings.  Finally, the jury=s damage finding
exceeds the estimate Frazier prepared; thus, the jury could have considered
rain damage in arriving at the total amount of covered damage.

c.       Cipriano
Sanchez=s Testimony

Sanchez=s cited testimony is similarly unhelpful. 
Spring Creek emphasizes that Sanchez was unaware of any leaking roofs at the
time of the tornado.  But Sanchez was aware of preexisting leaks and the
general tendency of the flat roofs at Spring Creek to leak:

Q:      At the time of the tornado, as far as you
know, were there any roofs out there leaking at Spring Creek Village
Apartments?








A:      At the time of the tornado - - not that I
knew because the ones that were leaking, I would fix them right away so
- -

Q:      Okay.

A:      - - at
that moment, probably not.

(emphasis
added).  Sanchez further testified that in the year before the tornado, he
repaired leaks in 20 buildings of the apartment complex.[31] 
Sanchez did not attribute these leaks to storm damage, but instead explained
that they were related to metal flashing: 

A:      [O]n the
roofs, especially on flat roofs, the metal expands and contracts depending on
the heat, if it is cold or hot, so most of the leaks on a flat roof are on the
perimeter of the roof, on the edge, and that=s why when two
flashings meet together, something, one was raised, probably, 1 inch.

d.       David
Laurent=s Testimony

David Laurent testified that in 2001, he replaced 11 roofs
for the subsequent owners of the apartment complex.  According to Laurent, he
determined there was latent, tornado-related damage to the roofs that was not
detected by any of the prior appraisers.  This testimony conflicts with
evidence provided by several other appraisers.[32]


e.       Leonard
Taylor=s Testimony








Spring Creek additionally relies on Taylor=s testimony.  As
previously noted, Taylor relied in part on the work of Edwards.  Taylor further
agreed that the Calvary and Jansen estimates may have been correct at the time
they were written.  Moreover, he admitted he included weather-related damages
regardless of whether the damages were the result of the tornado.  Taylor=s testimony is not
inconsistent with an inference that some of the observed damage was caused by
preexisting leaks, by leaks due to the expansion and contraction of metal
flashing as described by Sanchez, or by holes caused when Global Steel drove
nails through the roofs.

3.       No
Harmful Error

For each of the foregoing reasons, we conclude the evidence
is factually sufficient to support the jury=s finding.  But
even if we concluded that error had occurred, only harmful errors are
reversible.  See Tex. R. App. P. 44.1(a). 
And even if the jury failed to consider an additional half million dollars of
damages, the total damages would still be less than $1 million; thus,
General Star=s excess coverage would not be reached.  See
G.R.A.V.I.T.Y. Enters., Inc. v. Reece Supply Co., 177 S.W.3d 537, 546 (Tex.
App.CDallas 2005, no
pet.) (concluding that appellant waived complaint regarding trial court=s failure to
submit an instruction on good faith where the party=s appellate
briefing included Ano argument of why the instruction was
necessary to support its cause of action for breach of the agreement, nor any
argument of how the instruction=s absence harmed@ the appellant); Hernandez
v. Am. Appliance Mfg. Co., 827 S.W.2d 383, 385 (Tex. App.CCorpus Christi
1992, writ denied) (where the deceased=s beneficiaries
needed findings of damages exceeding $3 million to recover anything, Athere was a >cushion= of $1,345,000
which the jury could have found in pain and suffering, and still a take-nothing
judgment would have been proper@).  Spring Creek did not establish that the
jury failed to consider damages in an amount that would have reached General
Star=s layer of
coverage.  For this additional reason, we overrule Spring Creek=s first issue.

E.      Motion for
New Trial








When the party with the burden of proof moves for a new
trial on the ground that the evidence is factually insufficient to support the
verdict, we review the trial court=s denial of the
motion for abuse of discretion.  Champion Int=l Corp. v. Twelfth
Court of Appeals, 762 S.W.2d 898, 899 (Tex. 1988) (per curiam).  Because
the evidence is factually sufficient to support the verdict, the trial court
did not abuse its discretion by denying Spring Creek=s motion for new
trial.  We therefore overrule Spring Creek=s second issue.

V.  Conclusion

We conclude that the jury=s finding
regarding the amount of covered property damage is not against the great weight
and preponderance of the evidence.  Thus, the trial court properly signed a
take-nothing judgment and denied Spring Creek=s motion for new
trial.  We therefore affirm the trial court=s judgment.   

 

 

 

/s/      Eva M. Guzman

Justice

 

Judgment rendered and Opinion filed
June 24, 2008.

Panel consists of Justices Yates,
Guzman, and Price.*









[1]  According to the testimony of meteorologist Ron
Stagno, an F-1 tornado produces winds of 73B112
mph. 





[2]  On the same day, the fire department responded to
smoke from an item left near a stove when the power was off.  When power was
restored, the object caught fire, sending smoke into several apartments.





[3]  Calvary Construction was hired by McLain to estimate
the interior damage to the apartments and process McLain=s exterior and roof estimates.





[4]  The estimate was signed by George Farmer.





[5]  Global Steel sent Tracy an invoice for $45,403.87
for this work.





[6]  This included payment for fire-damaged apartments as
well.





[7]  Sheldon McCaman, Assistant Vice President, Boiler
& Machinery Property Claims for Reliance National.





[8]  Gen. Star Indem. Co. v. Spring Creek Vill.
Apartments Phase V, Inc., 152 S.W.3d 733, 736B37 (Tex. App.CHouston [14th Dist.] 2004, no pet.) (AGen. Star II@)
(reversing summary judgment in favor of Spring Creek on its attempt to enforce
Taylor=s award because Spring Creek=s appraiser, Steve Edwards, had a financial interest
in returning an estimate above $2 million, thereby raising a fact issue as to
his impartiality; Taylor admitted that the award was based in part on Edwards=s estimate).





[9] Id. at 736.





[10]  Id.  The ruling on this extracontractual
claim was not appealed.





[11]  Spring Creek=s
claim that Reliance and General Star had breached their contracts was tried
separately from Spring Creek=s claim that
the insurance companies had violated provisions of the Insurance Code and the
DTPA. 





[12]  Gen. Star Indem. Co. v. Spring Creek Vill. Apartments Phase V, Inc., No. 01-01-01181-CV, 2002 WL
243300 (Tex. App.CHouston [1st Dist.] Feb. 21, 2002,
no pet.) (per curiam, not designated for publication) (AGen. Star I@) (dismissing appeal of non-final
judgment).





[13]  Gen Star II, 152 S.W.3d at 736.





[14]  Id.





[15]  Id. at
737. 





[16]  Id. at 738.





[17]  Spring Creek does not challenge this finding on
appeal.  The jury did not find that General Star=s appraiser, John Lochridge, lacked impartiality. 





[18]  See Gen. Star II, 152 S.W.3d at 737 (AIf the jury finds the appraiser is [not] impartial, it follows that the
appraisal award was not in compliance with the insurance policy and is not
binding.@).  





[19]  The jury also found that Spring Creek had an actual
loss of business income of $16,000 Adue
to the necessary suspension of Spring Creek=s
operations during the period of restoration@
following the tornado.  Because Spring Creek provided no briefing regarding the
jury=s finding of lost business income, any challenge to
that finding is waived.  Tex. R. App. P.
38.1.





[20]  At that time, 250B260 units were rented out of a
total of 314 units. 





[21]  Frazier, however, did not go onto the roof.





[22]  Based on the following question, the word Acause@ rather than Acost@ may have been
intended.





[23]  These were the temporary repairs performed by AC
Roofing.





[24]  Tracy further testified that, in 1996, he refinanced Spring Creek and
used to the money to invest in building mini-storage units with David Booth.





[25]  Appellant=s
Brief, at 2.





[26]  See, e.g.,
Gulf States Utils. Co. v. Low, 79 S.W.3d 561, 566 (Tex. 2002); Vela v.
Wagner & Brown, Ltd., 203 S.W.3d 37, 49B50 (Tex. App.CSan Antonio 2006, no pet.); KW Constr. v. Stephens &
Sons Concrete Contractors, Inc., 165 S.W.3d 874, 887 (Tex. App.CTexarkana 2005, pet. denied); Price
Pfister, Inc. v. Moore & Kimmey, Inc., 48 S.W.3d 341, 352 (Tex. App.CHouston [14th Dist.] 2001, pet.
denied); Knox v. Taylor, 992 S.W.2d 40, 50, 62 (Tex. App.CHouston [14th Dist.] 1999, no
pet.); Duggan v. Marshall, 7 S.W.3d 888, 893 (Tex. App.CHouston [1st Dist.] 1999, no pet.);
Howell Crude Oil Co. v. Donna Crude Refinery Partners, Ltd., 928 S.W.2d
100, 108 (Tex. App.CHouston [14th Dist.] 1996, writ
denied); City of Houston v. Harris County Outdoor Adver. Ass=n, 879 S.W.2d 322, 334 (Tex. App.CHouston [14th Dist.] 1994, writ
denied). 





[27]  The Jansen estimate is undated.  Scott Tracy
testified that he fired Greg Herring, the Jansen appraiser, in mid-March, and
Herring testified that he no longer worked for Jansen after March or April of
1998.





[28]  No jury misconduct is alleged in this case.





[29]  Emphasis added.





[30]  Vela, 203
S.W.3d at 48. 





[31]  At various places in the record, the total number of
buildings is stated as 29, 30, or 33.





[32]  Moreover, Laurent agreed his opinion was based in part on the
assumption that there were only two prior storms that could have caused the
damage, and that all damage from the May 1999 windstorm had been repaired,
leaving only the 1998 tornado damage.





* 
Sr. Justice Frank C. Price sitting by assignment.